**Victor Sherman (State Bar No. 38483)**
**LAW OFFICES OF VICTOR SHERMAN**
**11400 West Olympic Blvd., Suite 1500**
**Los Angeles, CA 90064**
**Telephone: (424) 371-5930**
**Facsimile: (310) 392-9029**
**Email: victor@victorsherman.law**

**Mark Werksman (State Bar No. 120767)**
**WERKSMAN JACKSON & QUINN LLP**
**888 West Sixth St., Fourth Floor**
**Los Angeles, CA 90017**
**Telephone: (213) 688-0460**
**Facsimile: (213) 624-1942**
**Email: mwerksman@werksmanjackson.com**

**Attorneys for Defendant**
**JAMAL NATHAN DAWOOD**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CASE NO. 23-CR-00038-JVS** |
| Plaintiff, | **DEFENDANT JAMAL DAWOOD'S SENTENCING MEMORANDUM; EXHIBIT** |
| vs. | |
| JAMAL NATHAN DAWOOD, | |
| Defendant. | |

**TABLE OF CONTENTS**

**PAGE(S)**

I.    INTRODUCTION ....................................................................................2

II.   GUIDELINES CALCULATION .........................................................3

      A.    THE OBSTRUCTION ENHANCEMENT DOES NOT APPLY ........3

            1.    THE EXECUTION OF THE SEARCH WARRANT...............3

            2.    THE PROFIT-SHARING AGREEMENT AND AGREEMENT FOR SALE OF MEMBERSHIP INTEREST ................................................................................6

      B.    THE ABUSE OF POSITION OF TRUST ENHANCEMENT DOES NOT APPLY ............................................................................8

      C.    THE VULNERABLE VICTIM ENHANCEMENT DOES NOT APPLY ...........................................................................................10

      D.    THE ACTUAL LOSS, IF ANY, IS FAR BELOW $2,202,688, WHICH HAS NOT BEEN ESTABLISHED BY A PREPONDERANCE OF THE EVIDENCE ...................................12

III.  PERSONAL HISTORY AND CHARACTERISTICS OF THE DEFENDANT (18 U.S.C. § 3553(a)(1)).........................................15

      A.    CHILDHOOD IN WAR-TIME LEBANON ...................................15

      B.    FAMILY DYNAMICS AND DISPLACEMENT ............................16

      C.    IMMIGRATION AND ADAPTATION IN THE UNITED STATES ..........................................................................................17

      D.    ADULT LIFE, WORK, AND FAMILY RESPONSIBILITIES ........18

      E.    MENTAL AND EMOTIONAL HEALTH.......................................18

      F.    SUPPORT FROM FAMILY AND THE COMMUNITY .................19

IV.   ADDITIONAL § 3553(a) FACTORS..............................................20

      A.    THE NEED FOR THE SENTENCE TO PROTECT THE PUBLIC AND PROVIDE TREATMENT (18 U.S.C. § 3553(a)(2)(C) AND (D)).................................................20

      B.    THE NEED TO PROVIDE RESTITUTION TO THE VICTIM (18 U.S.C. § 3553(a)(7)) .........................................................21

IV.   CONCLUSION....................................................................................22

**TABLE OF AUTHORITIES**

**PAGE(S)**

**SUPREME COURT CASES**

*Ellingburg v. United States*
607 U.S. No. 24-482, 2026 WL135982 (U.S. Jan. 20, 2026) .......................15

*Pepper v. United States*
562 U.S. 476 (2011)............................................................................................3

**FEDERAL CASES**

*United States v. Adelson*
441 F. Supp. 2d 506 (S.D.N.Y. 2006) .............................................................2

*United States v. Castellanos*
81 F.3d 108 (9th Cir. 1996) ............................................................................11

*United States v. Contreras*
581 F.3d 1163 (9th Cir. 2009) ..........................................................................8

*United States v. Greer*
158 F.3d 228 (5th Cir. 1998) .............................................................................4

*United States v. Ho-Romero*
F.4th, No. 23-3848 (9th Cir. 2026)..................................................................4

*United States v. Lamb*
6 F.3d 415 (7th Cir. 1993) ..............................................................................10

*United States v. Laurienti*
611 F.3d 530 (9th Cir. 2010) ............................................................................8

*United States v. Lucas*
101 F.4th 1158 (9th Cir. 2024) .......................................................................13

*United States v. Manning*
106 F.4th 796 (8th Cir. 2024) ...........................................................................5

*United States v. McFadden*
70 Fed. Appx. 31 (2d Cir. 2003)......................................................................5

*United States v. Navarro*
979 F.2d 786 (9th Cir. 1992) ..........................................................................13

*United States v. Pardo*
25 F.3d 1187 (3d Cir. 1994) ...........................................................................10

*United States v. Showalter*
569 F.3d 1150 (9th Cir. 2009) ........................................................................13

*United States v. Welshans*
892 F.3d 566 (3d Cir. 2018) .............................................................................5

**PAGE(S)**

*United States v. Willard*
230 F.3d 1093, 1096 (9th Cir. 2000) ...............................................................9

**FEDERAL STATUTES**

18 U.S.C. § 3553(a)(2)(C) and (D)) ........................................................15,20,21,22

**UNITED STATES SENTENCING GUIDELINES**

U.S.S.G. § 1B1.3 ...............................................................................................13

U.S.S.G. § 2B1.1 .........................................................................................3,12,13,15

U.S.S.G. § 2S1.1 ...................................................................................................3

U.S.S.G. § 3A1.1 ...............................................................................................3,10

U.S.S.G. § 3B1.3 ............................................................................................*passim*

U.S.S.G. § 3C1.1 ............................................................................................*passim*

Victor Sherman (State Bar No. 38483)
LAW OFFICES OF VICTOR SHERMAN
11400 West Olympic Blvd., Suite 1500
Los Angeles, CA 90064
Telephone: (424) 371-5930
Facsimile: (310) 392-9029
Email: victor@victorsherman.law

Mark Werksman (State Bar No. 120767)
WERKSMAN JACKSON & QUINN LLP
888 West Sixth St., Fourth Floor
Los Angeles, CA 90017
Telephone: (213) 688-0460
Facsimile: (213) 624-1942
Email: mwerksman@werksmanjackson.com

Attorneys for Defendant
JAMAL NATHAN DAWOOD

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JAMAL NATHAN DAWOOD,<br><br>Defendant. | CASE NO. 23-CR-00038-JVS<br><br>**DEFENDANT JAMAL DAWOOD'S SENTENCING MEMORANDUM; EXHIBIT** |

**TO THE HONORABLE JAMES V. SELNA, UNITED STATES DISTRICT JUDGE, AND ASSISTANT UNITED STATES ATTORNEYS KRISTIN SPENCER AND MELISSA RABBANI:**

1

# I.
# INTRODUCTION

Having presided over the trial, the Court is well aware of the evidence and allegations in this case. However, the Court has not yet had the opportunity to learn about the man on the other side of the "v."  For that reason, this memorandum provides a complete picture of Mr. Dawood's life, his commitment to education and professional excellence, and his current family circumstances. These are all critical considerations because "if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." United States v. Adelson, 441 F. Supp. 2d 506 (S.D.N.Y. 2006). Here, after undertaking that assessment, Mr. Dawood respectfully suggests that a sentence of no more than 24 months is sufficient but not greater than necessary to satisfy the relevant sentencing factors.

At the outset, the Court should adopt the PSR's Guidelines calculations, with the exception of the loss determination and vulnerable-victim enhancement. Under controlling law, there is (at most) a 12-level loss enhancement, not 16 levels. Moreover, the record fails to establish that Mr. Battaglia fell within the particular Guidelines definition of a "vulnerable victim" because he did not have a medical condition that made him especially susceptible to the criminal conduct. Finally, as to the additional increases advanced by the government, they have been properly rejected by the probation department as unsupported by the record and prior precedent. Correctly calculated, therefore, the total offense level is 22.

As to Criminal History Category, Mr. Dawood's sole prior scoring offense occurred more than 25 years ago. Thus, although he is technically in CHC II, his conviction has nearly aged out. In any event, at level 22 in CHC II, the low-end of the range is 46 months. From there, given all the mitigating circumstances, and consistent with the principle that 'the punishment should fit the offender and not merely the crime," Mr. Dawood respectfully requests the Court vary to a

parsimonious sentence of no more than two years. <u>Pepper v. United States</u>, 562 U.S. 476, 487-88 (2011). Considering that "even a single [] day of incarceration is of substantial significance," that is the appropriate result.

## II.
## GUIDELINES CALCULATION

The PSR proposes the following Guidelines calculation:

Base Offense Level:                          7
(U.S.S.G. § 2S1.1(a)(1))

Loss Amount Between $1.5 million
and $3.5 million:                           +16
(U.S.S.G. § 2B1.1(b)(1)(I))

Sophisticated Means:                        +2
(U.S.S.G. § 2B1.1(b)(10)(C))

Money Laundering:                           +1
(U.S.S.G. § 2B1.1(b)(1)(I))

Vulnerable Victim:                          +2
(U.S.S.G. § 3A1.1(b)(1))

Total Guidelines Level: 28
Criminal History Category: II

PSR, p. 4; ¶¶ 37, 40, 42, 45.

The government has requested two additional enhancements for abuse of a position of trust and obstruction of justice. Neither these nor the enhancement for vulnerable victim apply in this case. Furthermore, the loss amount is significantly overstated and must be reduced by the value of assets and services received by Tom Battaglia and the trust.

## A.      THE OBSTRUCTION ENHANCEMENT DOES NOT APPLY

### 1.      THE EXECUTION OF THE SEARCH WARRANT

Probation considered but did not apply the enhancement for obstruction of justice under  U.S.S.G. §3C1.1. The government argues that it should apply based on Mr. Dawood's act of removing a box from his house when agents arrived to execute the search warrant.

The obstruction enhancement applies only where the government establishes, by a preponderance of the evidence, that the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the investigation or prosecution. U.S.S.G. § 3C1.1. The enhancement is reserved for deliberate acts of destruction or concealment of material evidence. It does not apply to ambiguous or reflexive conduct that does not meaningfully interfere with law enforcement. The Ninth Circuit recently reiterated that, "the term willfully in § 3C1.1 contains a clear *mens rea* requirement which limits the Guideline's scope to defendants who consciously act with the *purpose* of obstructing justice." United States v. Ho-Romero, -- F.4th --, No. 23-3848 (9th Cir. 2026) (cleaned up).

Application Note 4(D) specifically states that the enhancement does not apply to the attempted destruction or concealment of evidence that "occurs contemporaneously with arrest (e.g., attempting to swallow or throw away a controlled substance). . .unless it resulted in a material hindrance to the official investigation." U.S.S.G. § 3C1.1, cmt. n.4(D). The commentary recognizes that conduct occurring in the initial shock of law enforcement presence is more likely to reflect panic or confusion than a willful act. See, e.g., United States v. Greer 158 F.3d 228 (5th Cir. 1998) ("[Such decisions] are likely to be made on the spur of the moment and reflect panic, confusion, or mistake rather than a deliberate attempt to obstruct justice. In short, § 3C1.1 excludes conduct that does not tend to reflect a considered effort to derail investigations and prosecutions or significantly increase the risk that this in fact will happen.")

Here, the government's argument is based on Agent Schwartz's testimony that, when agents knocked and announced at 6:00 a.m., Mr. Dawood ran outside "in a t-shirt, boxers, and. . . barefoot," carrying a banker's box; stopped when agents shouted commands; looked "from side to side as if to do something with the box;" and placed the box "amongst the bushes" adjacent to the house. Trial Tr. Day 3, 164:2-165:13, July 24, 2025. The FBI immediately recovered the box.

4

This record does not establish a willful, considered effort to obstruct justice within the meaning of § 3C1.1. Rather, this is identical to a panicked decision to destroy contraband or run from police. At 6:00 in the morning, agents surrounded Mr. Dawood's house and knocked on the door, announcing themselves and ordering him to open the door. For the purposes of Application Note 4(D), the circumstances of the execution of the search warrant bear the same characteristics as an arrest; it is a sudden shock to the system and likely to produce reflexive or panicked reactions from people inside the home. Indeed, Mr. Dawood appeared "very briefly" thereafter, dressed as one would be when awakened, not when having planned to leave the house. Courts have applied Application Note 4(D) in the context of conduct occurring at the moment of a search warrant execution as opposed to limiting it strictly to the moment of arrest. See, e.g. United States v. Welshans 892 F.3d 566 (3d Cir. 2018).

The government's reliance on United States v. Manning 106 F.4th 796 (8th Cir. 2024) is misplaced.[1] The defendant in Manning went to his car and tried to drive away from his house. Id. at 798. He was blocked from leaving and ordered out of his car. Ibid. He was given a copy of the search warrant authorizing officers to seize cellphones, and officers seized one cellphone. Ibid. Backup officers arrived, and the defendant remained on scene during the search. Ibid. After the passage of some time, the defendant returned to his car and apparently attempted to destroy a second cellphone that was inside the car. Ibid. The Eighth Circuit emphasized that this was essentially a second attempt to remove the cellphone from the premises, which occurred after time had passed and after defendant had

---

[1] The government's analogy to United States v. McFadden 70 Fed. Appx. 31 (2d Cir. 2003) is weak on two grounds. First, the decision is unpublished. Second, the Court ruled that Application Note 4(D) was inapplicable solely on the grounds that "Moody buried the drugs and gun *before* the police arrived at the trailer, not contemporaneously with his arrest." Id. at 35 (emphasis in original). The Court found that fact alone dispositive. That decision is unavailing in this case.

clear notice that law enforcement sought digital devices. Id. at 802. The trial court characterized that conduct as "somewhere above [reflexive concealment] on the scale of culpability." Ibid. By contrast, Mr. Dawood's action was a single, immediate act occurring at the very outset of the encounter. There is no indication of any thought process on his part.

Finally, Mr. Dawood's conduct did not cause a material hindrance to the investigation, and the government has not argued that it did. The box was not removed from the premises, nor were its contents destroyed, altered, or rendered unavailable to investigators. There was no delay in the execution of the warrant or any loss of evidence. In plain view of multiple agents, Mr. Dawood placed the box down next to his house, very near where he was standing when agents told him to put it down. The FBI immediately recovered the box, with no additional time or resources required to find it.

Because the government has not established that Mr. Dawood willfully obstructed or attempted to obstruct the investigation, Probation correctly declined to apply the enhancement.

### 2.     THE PROFIT-SHARING AGREEMENT FOR SALE OF MEMBERSHIP INTEREST

The government also argues that the § 3C1.1 enhancement should apply based on its belief that Mr. Dawood produced forged documents during the investigation and trial. The enhancement applies where a defendant willfully produces "a false, altered, or counterfeit document during an official investigation or judicial proceeding." U.S.S.G. § 3C1.1, cmt. n.4(C). As with all obstruction findings, the government bears the burden of proving willful obstructive conduct by a preponderance of the evidence. The government has not met that burden.

The documents at issue were admitted into evidence at trial over the government's objection. Trial Tr. Day 5, 141:4-13, July 29, 2025 (Exhibit 115); 155:25-156:5 (Exhibit 60). A defense witness testified under oath that he observed

6

Mr. Battaglia sign the documents electronically. Id. at 141:2-3; 155:16-22. The government's position rests on the fact that Thomas Battaglia, in his Rule 15 deposition, denied the authenticity of a similar electronic signature, that the signatures on these documents appear dissimilar to other examples, and that the origin of the documents was contested. The government presented no forensic handwriting expert establishing forgery, no digital forensic evidence demonstrating alteration, and no direct evidence that Mr. Dawood created or affixed the signatures himself.

The government's argument thus rests on its supposition that the documents were forged, and that Mr. Dawood himself did the forging. But those documents were admitted into evidence over the government's objection. In doing so, the Court determined that there was sufficient evidence of authenticity to permit the jury to consider the documents in its deliberations. The government now asks the Court, on the same evidentiary record and without any additional forensic or expert evidence, to make a new affirmative finding that the documents were forgeries and that Mr. Dawood knowingly produced them for the purpose of misleading the Court. The jury's verdict in this case does not establish knowing fabrication.

Section 3C1.1 expressly warns against any application of the obstruction enhancement that effectively penalizes a defendant for presenting his defense and introducing evidence to support that defense. Application Note 4(C) does not convert the presentation of contested evidence into obstruction. This is a credibility dispute between one defense witness and one government witness. Courts should be exceedingly cautious before finding obstruction simply because of one side's belief about the other side's evidence. To apply the enhancement in this circumstance, the Court would have to find that the agreements were in fact forged and that Mr. Dawood knowingly produced them to mislead the Court. No such findings have been made, nor does the evidentiary record support them.

Because the government has not established that Mr. Dawood knowingly created or produced forged documents with the intent of obstructing the prosecution, the enhancement does not apply.

## B.     THE ABUSE OF POSITION OF TRUST ENHANCEMENT DOES NOT APPLY

The government objects to Probation's determination that a two-level enhancement under U.S.S.G. §3B1.3 does not apply, arguing that Mr. Dawood abused a position of private trust in his relationship with Thomas Battaglia. Application Note 1 clarifies, "a position of…private trust [is] characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference.)" The Guideline itself requires not only a position of trust but also that abuse of that position "significantly facilitated the commission or concealment of the offense." The Application Notes give examples of attorneys who defraud their clients, a bank executive, a physician who abuses a patient under the guise of an examination, or an individual who falsely represents himself to an investor as an investment broker or to a patient as a physician.

The Ninth Circuit has held, "a person must hold a position of professional or managerial discretion. The defendant must be a professional or manager who, because of his special knowledge, expertise, or managerial authority, is trusted to exercise substantial discretionary judgment that is ordinarily given considerable deference." United States v. Laurienti, 611 F.3d 530, 555 (9th Cir. 2010) (cleaned up). The Ninth Circuit notes that it is discretion that is the "decisive factor" in applying the enhancement. United States v. Contreras, 581 F.3d 1163 (9th Cir. 2009). The Ninth Circuit has held that the enhancement applies solely to professional relationships, not personal ones: "The [Guideline] commentary thus describes the relevant positions as ones involving professional or managerial discretion, contrasts positions of trust with the positions of employees, and gives examples of business positions only. The text of the commentary thereby

8

forecloses application of § 3B1.3 to purely familial relationships." United States v. Willard, 230 F.3d 1093, 1096 (9th Cir. 2000) (cleaned up).

Mr. Dawood held no such professional or managerial position. He was not a trustee, executor, or an attorney for the Trust or for Jack or Tom Battaglia. He was not a licensed financial advisor, and there is no evidence that he held himself out to be. Mr. Battaglia testified that a friend of Jack Battaglia's referred him to Mr. Dawood as "an individual who could help me sell the property, repair it, fix it up, and do whatever's necessary for the sale of the property." Rule 15 Deposition Tr., 15:16-19. When asked, "How did Jimmy Dawood introduce himself to you?" Mr. Battaglia answered, "As someone who could quote, unquote, help restore my brother's property to full salable condition." Id. at 17:10-14. The trustee of the trust was Tom Battaglia himself, and as was clear from the Rule 15 deposition as well as the testimony of Noelle Marini, Mr. Battaglia was an educated professional who was very knowledgeable about financial matters. There is no evidence that he was confused and believed Mr. Dawood to have any professional or managerial role related to the trust.

Furthermore, the government's version of the evidence was that Mr. Dawood caused Mr. Battaglia to transfer money and property to him by misrepresenting where the money was going. The government argued: "At the defendant's direction, Tom signed checks and approved transfers out of the trust account. Tom testified that he did that because defendant told him those transfers were for the benefit of the trust, for example, to pay off the mortgage on Jack's house." Trial Tr. Day 2, 16:22-17:1, July 23, 2025. Likewise, Tom Battaglia transferred properties to companies controlled by Mr. Dawood because, "Tom did that, he'll tell you, because he thought it would protect the assets." Id. at 18:15-15. In other words, the alleged fraud worked by Mr. Dawood misrepresenting where the money was going in order to induce Battaglia to make the transfers, not by Mr. Dawood abusing his own discretion in order to make the transfers himself. Both

9

sides agree that Mr. Dawood was never authorized to act on behalf of Tom Battaglia or the trust. See, e.g., United States v. Lamb, 6 F.3d 415, 422 (7th Cir. 1993) ("a position of trust is characterized by access or authority over valuable things"); United States v. Pardo, 25 F.3d 1187, 1192 (3d Cir. 1994) (In denying to apply the enhancement: "Even more clearly lacking in Pardo's case is the requisite degree of authority over the object of his wrong.")

Of course, on the government's version of the evidence, the alleged fraud was able to occur because Mr. Battaglia trusted Mr. Dawood and followed his instructions. That is the nature of most frauds. There is an *abuse of trust*. But as the cases demonstrate, that is not the same as being in *a position of trust* the abuse of which *significantly* facilitates the offense.

As with all sentencing enhancements, the government must prove applicability by a preponderance of the evidence. On this record, it cannot meet that burden. Mr. Dawood held no professional or managerial role. He had no authority or discretion to act independently. The alleged fraud operated based on misrepresentation, not abuse of discretion. For these reasons, the Court should follow Probation's determination that the two-level enhancement under U.S.S.G. § 3B1.3 does not apply.

## C.   THE VULNERABLE VICTIM ENHANCEMENT DOES NOT APPLY

The government has not met its burden to establish that Thomas Battaglia was a "vulnerable victim" within the meaning of U.S.S.G. § 3A1.1(b)(1). The record demonstrates that Mr. Battaglia was a man in his upper 70s managing a substantial estate, not an unusually vulnerable individual suffering from cognitive impairment, mental infirmity, or diminished capacity. Age alone is insufficient to support the enhancement, and even if it were, septuagenarians are not inherently infirm. The Ninth Circuit has repeatedly held that the victim's vulnerability must be unusual and must be based on a particularized finding as to this victim. United

States v. Castellanos 81 F.3d 108 (9th Cir. 1996). There is no evidence that Tom Battaglia was vulnerable – unusually or otherwise – at the time of the offense.

The Rule 15 deposition taken in October 2023 strongly undermines any suggestion that Mr. Battaglia was suffering from cognitive impairment or diminished functioning four years prior. The deposition was taken while Mr. Battaglia was hospitalized following a stroke and a heart attack. Yet, he stated that he was not experiencing any confusion, affirmed that he had no difficulty remembering his interactions with Mr. Dawood, and responded coherently and in detail to the government's questions regarding bank accounts, property holdings, and property and financial transactions. He described the structure of his brother's estate, the liquidation of accounts, and the routing of funds through particular banks. He identified institutions such as Cetera, Putnam, Financial Strategies, Caltech Federal Credit Union, and the Bank of America. He recalled the specific addresses and unit numbers of the Honolulu properties, and he articulated sensible plans to sell certain property while retaining those that generated rental income.

This deposition occurred four years after the alleged crime and while Mr. Battaglia was hospitalized. The deposition demonstrates that Mr. Battaglia was not especially vulnerable at age 81, even while recovering from serious health problems. This undermines any suggestion that Mr. Battaglia's cognitive ability was particularly vulnerable or diminished four years prior.

Further, the testimony from Noelle Marini demonstrates that Mr. Battaglia was under no mental impairment at the time of the alleged offenses. Ms. Marini, a close friend of Mr. Battaglia's, testified in detail regarding her visit to Mr. Battaglia three months after Jack's death, at the time of his first meeting with Mr. Dawood. Ms. Marini made absolutely no mention of Mr. Battaglia suffering from any particular emotional, intellectual, or psychological impairment. She described sitting in on a meeting between Mr. Dawood and Mr. Battaglia, and she made no observations about Mr. Battaglia appearing confused or overwhelmed. This

11

occurred in the immediate aftermath of Jack's death, at the time of his burial ceremony. If Mr. Battaglia had been unusually vulnerable, she would have seen it and testified about it. She offered no such evidence because Mr. Battaglia was not suffering from any such marked infirmity.

The enhancement also requires that the defendant knew or should have known of any such vulnerability. Here, Mr. Battaglia testified that he was referred to Mr. Dawood by a friend of Jack Battaglia's. There is no evidence that Mr. Dawood sought out Mr. Battaglia or that he targeted Mr. Battaglia because of his age or any cognitive impairment. There was also no evidence that Mr. Battaglia was showing obvious signs of impairment from which Mr. Dawood knew or should have known of Mr. Battaglia's unusual vulnerability.

There is simply no evidence to support the claim that Tom Battaglia was vulnerable at all, let alone uniquely vulnerable to apply the vulnerable victim enhancement.

**D.    THE ACTUAL LOSS, IF ANY, IS FAR BELOW $2,202,688, WHICH HAS NOT BEEN ESTABLISHED BY A PREPONDERANCE OF THE EVIDENCE**

The PSR asserts that the actual loss attributable to the offense is $2,202,688. PSR ¶ 37. This results in a 16-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(I). Ibid. The report does not, however, identify the transactions, funds, or property included in that figure, explain how it was calculated, or cite to specific record evidence supporting it. The conclusory statement of the loss amount is insufficient to carry the government's burden. In fact, Tom Battaglia's estate has gained value from his transactions with Mr. Dawood. Although it was not proven at trial, even assuming that the entire value of the Jack Battaglia trust was taken by Mr. Dawood in related conduct, the total loss is less than $550,000.

Counts 1 through 6 charged six specific wire transfers out of the trust account. Those six transfers total $1,434,053.45. Those are the transactions that were presented to the jury and returned as guilty verdicts. There was no finding

12

regarding loss. Nor was the jury asked to determine whether it was true that Dawood defrauded Battaglia out of the entire contents of the trust. The verdict reflects conviction for these six enumerated transfers, nothing more.[2]

If the government seeks to attribute additional amounts as relevant conduct under U.S.S.G. § 1B1.3, it must prove that additional conduct and the amount of resulting loss by a preponderance of reliable evidence. See, e.g., United States v. Lucas, 101 F.4th 1158 (9th Cir. 2024). The Ninth Circuit has emphasized that, while district courts may rely on undisputed statements in the PSR, "when a defendant raises objections to the PSR, the district court is obligated to resolve the factual dispute, and the government bears the burden of proof… The court may not simply rely on the factual statements in the PSR." United States v. Showalter, 569 F.3d 1150, 1160 (9th Cir. 2009). While a district court may adopt the factual findings of the presentence report, it may not adopt conclusory statements unsupported by facts or by the Guidelines. United States v. Navarro, 979 F.2d 786, 789 (9th Cir. 1992). Unless and until the government proves additional relevant conduct by a preponderance of reliable evidence, the only loss amount clearly supported by the verdict is the sum of the six wire transfers, $1,434,053.45.

From this amount, the Court must subtract any value that remains in the possession of Tom Battaglia or the trust, as well as the value of any service rendered to Tom Battaglia or the trust. Application Notes 3D(i) and (ii) to U.S.S.G. § 2B1.1 expressly require that loss be reduced by "the fair market value of the property returned and the services rendered . . . to the victim before the offense was detected" and "the fair market value of [any] collateral at the time of sentencing." The Guidelines measurement is one of net harm, not gross transfers.

The wire transfer in Count 2 was used to purchase, for the trust, a 49% ownership interest in Globe Design Build LLC. Trial Exhibit 60; Trial Exhibit 223.

---

[2] The money laundering convictions are not considered for the purposes of calculating the loss amount.

13

Mr. Diab testified that he prepared the sale agreement for this ownership interest, and that he prepared Trial Exhibits 223 and 228 establishing the value of Globe Design Build's assets at the time of the purchase and as of July 2025. Trial Tr. Day 5, 161:7-21, July 29, 2025. Mr. Diab testified that Tom Battaglia's estate still owns a 49% share of Globe Design Build worth $932,639.74.[3] Id. at 162:15-24. That is not lost value; it still belongs to Mr. Battaglia's estate, and in fact it has grown since his initial $654,063.80 investment. The Guideline requires that the loss amount be reduced by the fair market value of what the victim retained. The failure to apply this offset equates money transferred with money lost.

The loss amount must also be reduced by the value of the renovation work performed at Mr. Battaglia's direction on the Calle Aquamarina property prior to its sale. Mr. Diab testified to Trial Exhibit 213 and the total cost of the renovation of the Calle Aquamarina property, $743,000. Trial Exhibit 213; Trial Tr. Day 5, 130:22-25, July 29, 2025. There is no dispute that Mr. Dawood and those employed by him put in extensive work on remodeling Calle Aquamarina prior to its sale. Trial Exhibits 214 and 222 contain photographs of the renovation process, lasting approximately ten months, and the attractive finished product, with a much higher market value than the Calle Aquamarina house had when it went into the Jack Battaglia trust. This does not even consider the uncontroverted fact, made plain in the Jack Battaglia Statement of Trust (Trial Exhibit 2, p. 4), that the house had been bequeathed to Brandon Lannan and was never Tom Battaglia's to sell, improve, or otherwise benefit from.

Even if the Court operates from the $2,202,688 figure offered by Probation (presuming the government proves it by a preponderance of the evidence as discussed above), it must be reduced by the $742,944.55 service rendered in

---

[3] Exhibit 228 and Mr. Diab's testimony showed the 49% ownership being worth $970,706.67. This is a clerical error; that is the value of the other 51% interest. 49% of Globe Design Build's total $1,903,346.41 value is $932,639.74

improving Calle Aquamarina. The amount must be further reduced by the $932,639.74 value in Globe Design Build retained by Tom Battaglia's estate. That brings the loss down to $527,103.71, resulting in only a 12-level increase for loss amount. If the Court begins with the loss amount supported by a preponderance of the evidence ($1,434,053.45), deducting the value of service rendered and remaining value in Globe Design Build demonstrates that Tom Battaglia and the Battaglia Trust actually *gained value*, to the tune of $241,530.84, and thus no increase should be added for loss amount under § 2B1.1(b)(1).

Finally, in light of the recent Supreme Court decision in <u>Ellingburg v. United States</u>, 607 U.S. ---, No. 24-482, 2026 WL135982 (U.S. Jan. 20, 2026), that restitution is a criminal punishment, Mr. Dawood objects to any restitution amount because the jury made no findings regarding loss amount. Even considering the convictions for Counts 1 through 6, as stated above, money moved without authorization or based on false pretenses does not equal value lost.

### III.
### PERSONAL HISTORY AND CHARACTERISTICS OF THE DEFENDANT (18 U.S.C. § 3553(a)(1))

**A.    CHILDHOOD IN WAR-TIME LEBANON**

Jamal Dawood was born in Beirut, Lebanon, in 1970. His formative years coincided almost entirely with the Lebanese Civil War, which erupted in 1975 and consumed the country for much of his childhood. These were not isolated incidents of unrest, but years of sustained violence, instability, and fear. Daily life for Mr. Dawood during this period often meant living underground, sheltering in parking garages and basements of high-rise buildings that had been converted into makeshift bunkers to protect residents from shelling and aerial bombardment.

For extended periods, there was no electricity, no running water, and limited access to food. Families slept in sleeping bags under dim gas-powered lamps, listening to the sounds of explosions echoing through the city. Schools were

15

frequently closed, and when education occurred at all, it was informal and sporadic, often conducted at home under dangerous and uncertain conditions. Mr. Dawood recalls that for much of his childhood, confinement was the norm rather than the exception. In an interview for this report, he described the living circumstances as follows:

> I remember living most of my life as a child underground … a lot of these high rise buildings became underground dungeons, parking garages— if they bomb the buildings you have shelter underground. No electricity, no water, Everyone sleeping in underground garage, no power. Living on flashlights and whatever …they used to have like these little lights that were ancient, worked off of gas, just enough light to see. A lot of sleeping bags. Horrible. Terror. You hear bombs. That was the whole growing up experience until my father received some information that a big event would be taking place in our neighborhood, our buildings were going to get affected, so he arranged for us to leave. While we were being transported to the airport, it really got worse. They burned our buildings. There were massacres and invasion.

The psychological toll of this environment was profound. Mr. Dawood grew up surrounded by trauma: neighbors killed or injured, families displaced, and, in some cases, people in his own building driven to suicide after witnessing the violent deaths of loved ones. These experiences left an indelible mark, shaping his emotional development and contributing to symptoms of anxiety and depression that persisted long after the war itself receded.

## B.  FAMILY DYNAMICS AND DISPLACEMENT

Mr. Dawood is one of five children—two older sisters and two younger brothers—born to parents whose marriage was deeply strained by the pressures of war. His father was a prominent religious figure and community leader who, because of his position, had access to information about impending military actions and the ability to coordinate with authorities. While this status sometimes allowed

16

him to secure food and necessities for others in their building, it also meant prolonged absences from the home and constant exposure to danger.

In September 1982, when Mr. Dawood was eleven years old, his family fled Lebanon. Their departure occurred just hours before a major massacre in Beirut; Mr. Dawood recalls watching news coverage of the violence unfold on television while already at the airport. The family's escape required passage through multiple military checkpoints, escorted in armored vehicles. It was also Mr. Dawood's birthday—a detail that underscores how indelibly the trauma of that moment is tied to his personal history.

## C.    IMMIGRATION AND ADAPTATION IN THE UNITED STATES

Upon arriving in the United States, the Dawood family settled initially in Oakland, California, living with relatives in a small home. The transition was abrupt and disorienting. Mr. Dawood moved from an educational system conducted in Arabic and French, often through homeschooling, into a fully English-speaking public-school environment. He entered school midstream, with little time to adjust linguistically or culturally.

Despite these challenges, Mr. Dawood adapted quickly. In part because of the isolation and lack of recreational outlets during his childhood, he had developed a strong academic discipline. With few distractions beyond books and study, he advanced rapidly through school, ultimately skipping grades and graduating from high school at the age of fifteen. His academic acceleration was not the product of privilege, but of necessity, structure, and an intense family emphasis on education as a means of survival and stability.

Over time, Mr. Dawood's father developed symptoms consistent with post-traumatic stress disorder and struggled with alcohol abuse. The household became emotionally volatile, and there were episodes of domestic conflict that included intimidation and emotional abuse. Police were occasionally called to the home. Eventually, the strain proved insurmountable, and Mr. Dawood's parents separated

and later divorced in the early 1990s. These family dynamics compounded the instability already created by war and displacement.

**D.    ADULT LIFE, WORK, AND FAMILY RESPONSIBILITIES**

In adulthood, Mr. Dawood built a professional life centered on real estate development, property management, and related financial services. He also engaged in medical research initiatives and humanitarian work through organizations focused on global health outreach. These efforts spanned decades and reflected a consistent pattern of industriousness and ambition.

Equally significant is Mr. Dawood's role within his family. He is married and the father of three children, and he is the primary caregiver for his elderly mother, who is eighty-six years old and suffers from cancer, physical frailty, and cognitive decline. She lives with him, and he is responsible for her daily care, transportation to medical appointments, and coordination of treatment. This responsibility is ongoing and substantial, and it has become a defining feature of his current life circumstances.

**E.    MENTAL AND EMOTIONAL HEALTH**

Mr. Dawood has not been formally diagnosed with a mental health disorder, but his history is marked by prolonged exposure to trauma during childhood, compounded by family instability and displacement. He reports symptoms consistent with depression and post-traumatic stress, particularly when recounting his experiences during the war. As a young person, he received informal counseling from a licensed clinical psychologist within his extended family, who helped him process the stress of war, immigration, and parental separation.

These experiences do not excuse criminal conduct, but they provide important context for understanding Mr. Dawood as an individual. His life reflects both resilience and unresolved trauma, which bears directly on his character, his

18

capacity for rehabilitation, and the Court's obligation to impose a sentence that is sufficient, but not greater than necessary to achieve the aims of sentencing.

## F.     SUPPORT FROM FAMILY AND THE COMMUNITY

Mr. Dawood has submitted character reference letters from family members, colleagues, and community members who have known him for many years. Exhibit A. These letters come from individuals in diverse professional roles, including a physician, a public health graduate student, licensed real estate professionals, and his wife and siblings, and collectively provide the Court with a broader perspective on his life outside the conduct of conviction.

A consistent theme throughout the letters is Mr. Dawood's role as a devoted father and primary caregiver. His wife describes him as follows:

> [Jimmy] is the most compassionate person I know. When I first met him, my grandmother in New Jersey had cancer, he would fly to the east coast to visit me often, only to help take care of her. During her final days, he would sit at her bedside all day just to hold her hand and comfort her. He did the same when my father was diagnosed with colon cancer. He was always there for him, talking to his doctors, and spending hours on the phone with my mother giving her ideas on how to keep my father physically and mentally strong. I truly believe my father's life was prolonged because of the love and care Jimmy showed him.

His brother, Dr. Ronnie Dawood, writes:

> For the past twenty years, he has been the primary source of emotional and financial support for our mother, who is now 86 years old and has been battling dementia and breast cancer. Jimmy has been her sole caregiver, providing her with daily care, companionship, and comfort. He took on this responsibility out of genuine love and compassion, not obligation.

His sister, Yola Awabdy, writes:

19

Jimmy has always been my protector and the heart of our family. When our parents divorced and my mother—who spoke limited English and did not drive— struggled to adjust, Jimmy stepped into a fatherly role at home. He made sure we continued our education and supported each of us in building successful lives. His leadership and compassion have been constants in our family's journey. With regards to my own children, he has always been the first Uncle they reach out to when they need help or advice. They all look up to him and greatly respect him.

Professional colleagues describe Mr. Dawood as diligent and committed to community development. Kevin Wolf, a real estate developer, states that Mr. Dawood's work has made "a tangible difference in promoting sustainable growth and opportunity" in the Inland Empire. Similarly, Sarkis Daghlian recounts long-standing professional interactions and describes him as "professional and ethical," even in contentious foreclosure situations.

Perhaps most telling is the letter from his nephew, Patrick Bayeh, who credits Mr. Dawood's mentorship with shaping his own path toward medicine and describes him as "the glue that holds our gatherings together." Across these letters, the recurring themes are family devotion, generosity, work ethic, mentorship, and sustained caregiving for the elderly.

## IV.
## ADDITIONAL § 3553(a) FACTORS

**A.   THE NEED FOR THE SENTENCE TO PROTECT THE PUBLIC AND PROVIDE TREATMENT (18 U.S.C. § 3553(a)(2)(C) and (D))**

There is no indication that Mr. Dawood presents a danger to the physical safety of the public. The instant offenses are non-violent, and nothing in his history suggests a propensity for violence. He has been completely compliant with all court orders since placed on pretrial supervision three years ago, and he has been cooperative with Probation throughout the presentence process.

The PSR appropriately identifies mental health and substance use issues that warrant treatment. Mr. Dawood has not received a formal psychiatric diagnosis,

20

but he experiences depression, anxiety, and symptoms consistent with trauma exposure. He has expressed a willingness to engage in mental health treatment and substance abuse counseling, and the Court's recommendation for evaluation and treatment is well-suited to address these needs.

From a rehabilitative standpoint, treatment and structured supervision would directly address the factors that contributed to Mr. Dawood's decline during the offense period. Extended incarceration is unlikely to further reduce risk, while targeted treatment and supervision can meaningfully reduce the likelihood of future misconduct.

**B.   THE NEED TO PROVIDE RESTITUTION TO THE VICTIM (18 U.S.C. § 3553(a)(7))**

Probation recommends substantial restitution in this case. The PSR correctly recognizes that Mr. Dawood lacks the immediate financial ability to satisfy the full restitution amount and recommends a structured payment plan, including nominal payments during incarceration and supervised release.

Mr. Dawood's ability to make meaningful restitution is directly tied to his capacity to work, earn income, and remain financially productive under supervision. A sentence that allows Mr. Dawood to rejoin the work force as quickly as possible and earn to support his family and pay his restitution obligation ultimately serves the interests of the victim and the purposes of sentencing.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

21

## IV.
## CONCLUSION

For the reasons set forth above, the advisory Guidelines range should be calculated without the obstruction, abuse of trust, and vulnerable victim enhancements, and with a drastically reduced loss amount that reflects the actual financial loss. Mr. Dawood respectfully requests that the Court consider the corrected Guidelines calculation together with all factors under § 3553(a), and to impose a sentence of no more than 24 months.

Dated: February 23, 2026                    Respectfully submitted,


                                   _____/s/_____
                                   Victor Sherman
                                   Mark J. Werksman
                                   Attorneys for Jamal Nathan Dawood

22